**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLIENT FUNDING SOLUTIONS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  10-cv-482 |
| | ) | |
| DEBBIE CRIM, a.k.a. Debbie Crim Clark, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE VRDOLYAK LAW GROUP, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Third-Party Plaintiff Debbie Crim's motion for leave to amend her operative third-party complaint [232] and motions in limine to exclude expert testimony by Gene Neri [226] and Peter Vrdolyak [231], Third-Party Defendant Vrdolyak Law Group's ("VLG") motions in limine numbers 1-12 [228] and motion for instructions [265], and the parties' supplemental written memoranda concerning issues raised by the Court. See [259], [260], [262], [263]. For the reasons stated below, the Court denies Crim's motion for leave to amend [232]; grants in part and denies in part her motions in limine, [226] and [231]; grants in part, denies in part, and reserves ruling on in part VLG's motions in limine [228]; and denies as moot VLG's motion for instructions [265].  This case remains set for status hearing on May 15, 2013 at 10:15 a.m.

**I.     Motion for Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R.

Civ. P. 15(a). Nevertheless, "courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Campania Mgmt. Co. v. Rooks, Pitt & Poust*, 290 F.3d 843, 849 (7th Cir. 2002). Delay alone is usually insufficient to deny a motion to amend, *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004); the Federal Rules of Civil Procedure countenance amendments during and after trial. See Fed. R. Civ. P. 15(b)(2). But "the longer the delay, the greater the presumption against granting leave to amend," *King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994) (internal quotation omitted), as "[e]leventh hour additions are bound to produce delays that burden not only the parties to the litigation but also the judicial system and other litigants." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008) (quotation and alterations omitted).

Crim filed her motion seeking leave to amend Count VIII of her second amended third-party complaint nearly eight months after the completion of discovery, a mere six weeks prior to the originally scheduled trial date, and only after VLG filed its motions in limine. See *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). She contends that the changes she wishes to make are "technical" in nature and will "clarify her claim * * * so that her case may be tried on the merits." [232]. VLG contends that Crim's proposed amendments raise a "new and completely different theory," such that allowing the amendment would prejudice it and require the reopening of discovery. [234]. The Court denies the motion, because granting Crim leave to amend her third-party complaint as requested at this late juncture would cause undue prejudice to VLG and would unduly delay the already protracted progression of this case.

From the outset, Crim consistently alleged in Count VIII a conspiracy between Plaintiff Client Funding Solutions ("CFS") and VLG to convert her settlement proceeds. See [21] ¶ 150;

[123] ¶ 153; [140] ¶ 177. "In furtherance of said conspiracy," she alleged, "CFS knowingly used information Vrdolyak revealed in breach of his fiduciary duty to Crim as the basis for this lawsuit and to attach the proceeds of Crim's settlement." [21] ¶ 151; [123] ¶ 153; [140] ¶ 178. She also alleged that "Vrdolyak used CFS' lawsuit as an excuse to withhold and convert all of the settlement proceeds not just the amount sought by CFS." [21] ¶ 153; [123] ¶ 156; [140] ¶180. The conspiracy described by these allegations is plainly – and solely – one to convert her settlement proceeds.

The parties' proposed pretrial order [230] expanded the scope of the alleged conspiracy, but did so in a manner consonant with the proceedings in the case up to that point. The pretrial order stated that "Count VIII of the complaint is for Conspiracy. [Crim] claims that she was damaged because [VLG] conspired with another to withhold money belonging to [Crim] and coerce [her] to pay a series of loans." [230] at 3. These sorts of "constructive amendments" to complaints are permissible, particularly where the parties agree as to the issues that have been or are being litigated. See *Torry v. Northrup Grumman Corp.*, 399 F.3d 876, 878-79 (7th Cir. 2005).

Crim's proposed third amended third-party complaint attempts to expand her allegations further still. Although Crim claims that "[t]he only thing that is being changed is the time period of the conspiracy," [244] at 5, it appears from the face of the proposed third amended third-party complaint that the scope and object of the alleged conspiracy have significantly changed. The proposed third amended third-party complaint omits any mention of conversion and instead alleges that "CFS and Vrdolyak conspired to induce Crim to enter into a lending relationship with CFS and obtain a large portion of Crim's litigation proceeds." [232-1] ¶ 177. It also adds allegations that the loans from CFS "violated the Truth in Lending Act by, among other things,

describing loan amounts that Crim never received," *id.* ¶ 178, and contends that "Vrdolyak used CFS' lawsuit as an excuse to withhold all of the settlement proceeds, not just the amount sought by CFS, and pressure Crim to settle with CFS to avoid further inquiry into CFS' illegal lending practices and the relationship between Vrdolyak and CFS." *Id.* ¶ 182 (omitting any mention of conversion). The allegations about settlement pressures were contained in the pretrial order, but the others were not and indeed have been largely absent from the proceedings.

Crim's proposed amendments change the character and substance of the alleged conspiracy. Rather than alleging a conspiracy to convert, the proposed amendments omit any mention of conversion and add allegations about inducement to use CFS, coercion to settle claims with them, and noncompliance with the Truth in Lending Act. This is a marked departure from Crim's earlier characterizations of the alleged conspiracy, which had at its "core" certain "demand letters" from CFS and the attachment of Crim's funds. See [76] at 3; see also [64] (describing conspiracy as "colluding with CFS to tie up Crim's funds"); [209] at 17 ("The act of filing the complaint was the unlawful purpose in furtherance of the conspiracy to deprive Crim of her money and force her to pay Client Funding."). Crim points to one paragraph of a summary judgment brief, see [209] at 18, and a single line of her deposition testimony, see [244] at 6, in an attempt to establish that the parties had "pretried" the Truth in Lending Act theory, see *Torry*, 399 F.3d at 878, such that VLG could not claim surprise or prejudice. See [232] ¶ 15. Complaints may be amended to conform to the evidence adduced, see Fed. R. Civ. P. 15(b), but two isolated suggestions after years of discovery do not evidence make. Likewise, although the parties exchanged discovery as to the relationship between VLG and CFS dating back to 2005, Crim's testimony as to her belief that VLG and CFS were "working together throughout the course of the time," her assertions that each loan transaction with CFS was initiated by Vrdolyak,

and her efforts to obtain a complete list of referrals to CFS do not serve to give VLG notice of her belatedly broadened conspiracy allegations. Permitting the requested amendment at this stage of the litigation would require further discovery (on top of the already costly and extensive discovery that has been taken in this case) to avoid prejudice to VLG and further postponement of the trial. See *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 875-76 (7th Cir. 2011). The motion for leave to amend [232] is denied.

## II. Nature of Breach of Fiduciary Duty Claim: Legal or Equitable

Following a discussion of the issue at the last pre-trial conference, the Court requested that the parties submit supplemental briefs concerning whether Crim is entitled to a jury trial on her breach of fiduciary duty claim [259]. After reviewing the parties' submissions, [260], [262], [263], and carefully examining the applicable law, the Court concludes that Crim's breach of fiduciary claim is equitable in nature and must be resolved by the Court.

Federal procedural law controls the question of whether there is a right to a jury trial. *Simler v. Conner*, 372 U.S. 221, 221 (1963); *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004). Federal Rule of Civil Procedure 38(a) provides that there is a right to a jury trial where either the Seventh Amendment or any federal statute so requires. Fed. R. Civ. P. 38(a); *Int'l Fin. Servs. Corp.*, 356 F.3d at 735. Because Crim has not pointed to any statutes supporting her contention that she is entitled to a jury trial on this claim, her right to a jury trial depends solely on the Seventh Amendment, *Int'l Fin. Servs. Corp.*, 356 F.3d at 735, which guarantees the right to a jury "In Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The Supreme Court has interpreted the phrase "Suits at common law" to refer to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and

equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (quoting *Parsons v. Bedford*, 3 Pet. 433, 447 (1830)). To determine whether a claim falls within the ambit of "Suits at common law," the Court must conduct a two-stage inquiry. First, it must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* at 42 (quoting *Tull v. United States*, 481 U.S. 412, 417-18 (1987)). "The second stage of this analysis is more important than the first." *Id.*; see also *Int'l Fin. Servs. Corp.*, 356 F.3d at 735.

There is no dispute that actions for breach of fiduciary duty historically were considered equitable. See, *e.g.*, *Pereira v. Farace*, 413 F.3d 330, 338 (2d Cir. 2005); *In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) (Breyer, J.) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity,' carrying with them no right to trial by jury."); *George v. Kraft Foods Global, Inc.*, 2008 WL 780629, at *3 (N.D. Ill. Mar. 20, 2008); *cf. Kinzer ex rel. City of Chi. v. City of Chi.*, 539 N.E.2d 1216, 1220 (Ill. 1989) ("This court has not accepted the Restatement (Second) of Torts view but has regarded breach of fiduciary duty as controlled by the substantive laws of agency, contract, and equity." (citations omitted)). The first stage inquiry thus indicates that the claim should be tried to the bench.

The second stage inquiry is the more important of the two, however. At this stage, the Court must determine whether the type of relief sought is equitable or legal. "Unfortunately, there is no cut-and-dried rule that allows a court to determine whether a remedy is equitable or legal in nature." *Int'l Fin. Servs. Corp.*, 356 F.3d at 736. As a general matter, though, legal remedies traditionally involve money damages, while "[e]quitable remedies, by contrast, are typically coercive, and are enforceable directly on the person or thing to which they are

directed." *Id.*

Crim seeks three distinct remedies in connection with her breach of fiduciary duty claim. First, she seeks disgorgement or forfeiture of the $800,000 in attorneys' fees that VLG received for representing her in the personal injury action. That is a precise and directly traceable sum. Although money would be disgorged or forfeited if Crim were to prevail, at bottom both disgorgement and forfeiture are equitable in nature. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (disgorgement); see *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012) ("Lastly, Scanlan seeks equitable relief, including * * * the disgorgement of attorneys' fees.") (disgorgement); *Johnson v. Gudmundsson*, 35 F.3d 1104, 1116 (7th Cir. 1994) ("Whether Johnson's breach was so egregious as to require the forfeiture of any compensation to which he may otherwise have been entitled is a discretionary and fact-dependent question to be resolved by weight all of the relevant equities") (forfeiture). "[T]he fact that disgorgement involves a claim for money does not detract from its equitable nature: in such an action, the court is not awarding damages to which plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment." *S.E.C. v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (quotation omitted).[1]

Second, Crim seeks to be reimbursed for the $225,000 that she paid to CFS in satisfaction of the litigation loans that she claims she never would have obtained but for VLG's breach in recommending CFS without fully disclosing the personal relationship between the entities or

---

[1] Even under the narrow definition of "equitable relief" that the Second Circuit has imported from ERISA law, under which the remedy of equitable restitution cannot be considered equitable unless the party from whom funds are sought must have possessed the funds (see *Pereira*, 413 F.3d at 339-405), Crim's request for relief in the form of the return to her from VLG the $800,000 in attorneys' fees derived from her personal injury case plainly qualifies as equitable relief.

researching CFS's interest rates. As explained more fully below in connection with the discussion of VLG's Motion in Limine No. 5, Crim potentially may be entitled to recover at most $116,500, as there is no dispute that she received the benefit of $108,500 in funds and she is not entitled to a windfall regardless of any injury that she may have suffered. If this were a claim against CFS, it, too, might be equitable in nature, as it essentially would be seeking disgorgement or forfeiture of funds that CFS possessed. But because Crim seeks recovery of those amounts from VLG, that portion of the relief that she seeks for the alleged breach of fiduciary duty appears to be legal in nature; it is money damages aimed at compensating Crim for a loss that she claims to have sustained.

Third, Crim seeks punitive damages "in the amount of three times the compensatory award or $600,000, whichever is greater," [230] at 5, "[i]n connection with the claims for breach of fiduciary duty and conversion." *Id.*[2] Punitive damages "are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 417 (Ill. 2006). Punitive damages are considered legal relief. See, *e.g.*, *Curtis v. Loether*, 415 U.S. 189, 196 (1974).

---

[2] Punitive damages are available in actions for breach of fiduciary duty. See, *e.g.*, *Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 387-88 (Ill. App. Ct. 1st Dist. 2004); *Levy v. Markal Sales Corp.*, 643 N.E.2d 1206, 1223 (Ill. App. Ct. 1st Dist. 1994). They are not available, however, "[i]n all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice." 735 ILCS 5/2-1115. "[T]he availability of punitive damages [in such cases] depends on whether plaintiffs' breach of fiduciary duty claim falls within 'the rubric of [legal] malpractice.'" *Brush v. Gilsdorf*, 783 N.E.2d 77, 80 (Ill. App. Ct. 3d Dist. 2003) (quoting *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 155 (Ill. App. Ct. 1st Dist. 2000)). VLG has never argued that Crim's breach of fiduciary duty claims "fall within the rubric of legal malpractice," nor does it appear that either party has mentioned 735 ILCS 5/2-1115 at any point during the three-year pendency of this litigation. The Court thus considers this potential defense to Crim's claims for punitive damages to be waived.

The dual nature of the relief Crim seeks presents a challenging question. On the one hand, it is well settled that "[a] suit seeking only equitable relief is not a suit at common law, regardless of the nature of the issues likely or even certain to arise in the case." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) (quoting *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 648 (7th Cir. 2002). At the same time, "[w]here both legal and equitable relief are sought by a plaintiff, the Seventh Amendment right to a jury trial requires that the legal claims be tried first, to a jury." *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004) (quoting *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 844 (7th Cir. 1978)). Here, the question is whether a judge or a jury should resolve a single claim in which the plaintiff seeks both legal and equitable relief as a remedy. Neither party has presented – nor has the Court located – any controlling authority addressing the proper procedure in these peculiar circumstances.

At least one district court to examine the question in analogous circumstances has concluded that a plaintiff seeking both legal and equitable relief for a breach of fiduciary duty claim has no right to have a jury decide that claim. See *Cantor v. Perelman*, 2006 WL 318666, at *8-9 (D. Del. Feb. 10, 2006). There, the court "consider[ed] the long history of treating breach of fiduciary duty claims as equitable and balance[d] that with the mixed equitable and legal remedies sought." *Id.* at *9. In addressing the first prong of the *Granfinanciera* test, the court had no difficulty concluding that the plaintiffs' breach of fiduciary duty claims[3] were equitable. *Id.* at *7. Then, turning to the second prong, the court determined that the plaintiffs sought both recovery of benefits (equitable relief) and compensatory damages (legal relief). *Id.* at *7-9. In

---

[3] The claims at issue in *Cantor* involved both breach of fiduciary duty and aiding and abetting a breach of fiduciary duty. See 2006 WL 318666, at *5.

so doing, the court specifically distinguished the relief sought in *Pereira* – namely, funds that the defendant never possessed, see *Pereira*, 413 F.3d at 340 – from the "benefits obtained by defendants [in *Cantor*] as a result of their breaches of fiduciary duty," which those defendants certainly did possess. *Cantor*, 2006 WL 318666, at *9. In the final analysis, the court found a "mixed result" under prong two, as the breach of fiduciary duty claims sought "both legal and equitable relief." *Id*. And in resolving the ultimate question of the appropriate finder of fact to resolve those claims, the court concluded that "the scales tip in favor of Plaintiffs' claims being judged equitable" because "[t]o weigh the factors differently would effectively ignore the historical factor, contrary both to the Seventh Amendment's purpose * * * and to the express holding of *Granfianciera*, 492 U.S. at 42, that history is to be accorded weight in the balancing." *Id*. at *9.

This Court finds *Cantor* both on point and persuasive. Here, as in *Cantor*, the first *Granfinanciera* factor points toward equity. The second either sits inconclusively in equipoise – Crim seeks both legal and equitable relief – or points toward equity, as the requested equitable relief predominates the parties' briefing of the issue. Even if the Court were to consider the second factor a wash, the first factor still tips the scale toward equity.

Of course, as the parties have recognized, the conclusion that Crim's breach of fiduciary claim is equitable in nature and ultimately must be resolved by the Court leaves on the table a series of issues relating to the format and presentation of evidence at trial. See *Int'l Fin. Servs. Corp.*, 356 F.3d at 737-39 (noting that "[a] jury trial does not have to include all or nothing" and discussing options such as bifurcating equitable issues, taking an advisory jury verdict on those issues, or resolving them in post-judgment motions under Federal Rule of Civil Procedure 69(a)). To begin with, to the extent that there are common factual issues between this equitable claim

and Crim's legal claims, those common issues of fact must be resolved by a jury, whose findings will in turn bind the Court. See *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004); *Int'l Fin. Servs.*, 356 F.3d at 737 n.1. In addition, certain evidence – for example, testimony of Crim's expert, Ms. Robinson, and VLG's expert, Mr. Collins – may pertain exclusively to the breach of fiduciary duty claim, it may not be relevant to the jury's fact-finding duties. The Court will address these issues with counsel and the parties at the next status hearing in an effort to resolve them in an orderly fashion before trial.

### III.     Motions to Exclude Expert Testimony

Both parties have filed motions [see 226, 228, 231] to exclude certain expert testimony. The Court addresses each motion in turn below.

#### A.     Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; see also *Ortiz v. City of Chi.*, 656 F.3d 523, 526 (7th Cir. 2011). "The non-exclusive list of *Daubert* reliability factors for scientific evidence includes whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4)

generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007). "Under Federal Rule of Evidence 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

In regard to qualifications, Federal Rule of Evidence 702 allows parties to introduce expert opinions if the expert has the requisite "knowledge, skill, experience, training, or education." Anyone who has relevant expertise and can offer responsible opinion testimony that is helpful to a judge or jury may qualify as an expert witness. See *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). In assessing an expert's qualifications, a court should consider the proposed expert's full range of education, experience, and training. *LG Elec. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 951 (N.D. Ill. 2009).

*Daubert* sets forth a number of relevant considerations in evaluating an expert's reasoning and methodology—including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert* 509 U.S. at 593-94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it

enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable") (emphasis omitted); *Lewis*, 561 F.3d at 704–05 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation.").

In assessing the admissibility of proposed expert testimony, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, as the Supreme Court has recognized, "conclusions and methodology are not entirely distinct from one another," and while "[t]rained experts commonly extrapolate from existing data[,] * * * nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. In other words, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (quotation omitted); see also *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010); *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting expert testimony where expert "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so'").

In short, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Where that link is missing, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion

proffered." *Gen. Elec.*, 522 U.S. at 146. Nonetheless, "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Finally, to the extent that *Daubert* issues relate to matters that will be tried to the Court, rather than a jury, the Court possess greater latitude in exercising its gatekeeping function. See *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Where the gatekeeper and the factfinder are one and the same – that is, the judge – the need to make such decisions prior to hearing the testimony is lessened. That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." (citation omitted)).

### B.     Crim's Motion to Exclude Testimony of Dr. Gene Neri

Crim has moved in limine to exclude the expert testimony of Dr. Gene Neri pursuant to Federal Rules of Civil Procedure 403 and 702. [226]. Neri is a physician who is board-certified in internal medicine, neurology, and psychiatry. These qualifications, which Crim does not challenge, render him qualified in certain circumstances to provide medical opinion testimony regarding symptoms and diagnoses. See *United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists.").

Crim takes issue with Neri's exclusive reliance on the reports of other physicians and his failure to examine her before rendering his diagnoses and conclusions. Neri admitted during his

deposition that in his medical practice, he would always examine a patient before offering a diagnosis. He must apply these same standards in the courtroom. See *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) ("The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." (quoting *Kumho Tire*, 526 U.S. at 152)). "[T]he law demands more than a casual diagnosis that a doctor may offer a friend or acquaintance outside the office about what could be causing his aches and pains." *Myers*, 629 F.3d at 644. With that said, the law is not so demanding as to prohibit Neri's reliance on the reports of other physicians and clinicians for other purposes in rendering his opinions under Rule 702. Federal Rule of Evidence 703 permits Rule 702 witnesses to rely on reports of others if persons in the field generally proceed in that fashion. See Fed. R. Evid. 703. As the original Advisory Committee Note to Rule 703 explains, doctors routinely rely on the statements and reports of others when reaching medical conclusions. See also *Walker v. Soo Line R.R.*, 208 F.3d 581, 588 (7th Cir. 2000) ("Medical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions."); *In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him – information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented." (citing Fed. R. Evid. 703)). Indeed, Crim's medical expert, Dr. Merriman, did so herself. Of course, "Rule 703 is not 'intended to allow oblique evasions of the of the hearsay rule,' by allowing 'a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Wielgus v. Ryobi Techs., Inc.*, 893 F. Supp. 2d 920, 928 (N.D. Ill. 2012) (quoting *Loeffel Steel Prods., Inc. v. Delta*

*Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)).

With these principles in mind, the Court grants in part and denies in part Crim's motion to exclude Neri's testimony [226]. The Court concludes that Neri may opine that:

(1) Crim's medical records reflect that prior to the dispute with VLG over the settlement funds in late 2009 and early 2010, she reported and exhibited symptoms of several of the conditions of emotional distress about which she complained at the time of that central dispute.

(2) The symptoms that Crim attributed to VLG's conduct therefore already were in existence well before December 2009 and there is nothing in the written records from her treating clinicians, including Merriman, to support a claim that the events involving VLG in late 2009 and early 2010 significantly could have exacerbated those pre-existing conditions.

Neri may not opine that:

(1) Crim suffers from "psychophysiological disproportion" and is motivated by intentions of secondary gain. Not only did Neri testify that this diagnosis was based on "feeling," he also testified that he would not make diagnoses in his practice without first examining a patient. He must adhere to the same rigorous standards in the courtroom as he does in his practice. *Jenkins*, 487 F.3d at 489.

(2) Crim's stress is the kind that most people would like to have. This testimony lacks a foundation in the records that Neri considered and does not rely on the type of specialized knowledge or skill that Neri possesses. Moreover, it is within the comprehension of lay people and based on their everyday experiences and therefore not helpful to the trier of fact. See *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602-03 (7th Cir. 2011) ("[W]hen the expert testimony is about a matter of everyday experience, expert testimony is less likely to be admissible.").

(3) Crim would have placed her unrelated health and family issues ahead of the lawsuit as

primary causes of her stress during the relevant period. This testimony also lacks a foundation in the records that Neri considered and does not rely on the type of specialized knowledge or skill that Neri possesses. In addition, it, too, lies within the comprehension of lay people based on their everyday experiences and therefore is not helpful to the trier of fact. See *Florek*, 649 F.3d at 602-03.

(4) Other clinicians offered specific opinions as to Crim. Although Neri may rely on reports of other clinicians in rendering his own opinion, see Fed. R. Evid. 703; *Walker*, 208 F.3d at 588, all opinions that he actually offers must be his own. He may not serve as a "mouthpiece" for the other clinicians whose records he reviewed. *Wielgus*, 893 F. Supp. 2d at 928.

(5) That VLG's conduct was not "so severe that no reasonable man could be expected to endure it or so extreme as to go beyond all possible bounds of decency and regarded intolerable in a civilized community," or any opinions that amount to legal conclusions. Rule 702 witnesses may not testify to legal conclusions. See *United States v. Lupton*, 620 F.3d 790, 800 (7th Cir. 2010); *Clintec Nutrition Co. v. Baxa Corp.*, 1998 WL 560284, at *9 (N.D. Ill. Aug. 26, 1998) ("Legal conclusions are not admissible because they are not helpful to the trier of fact."). The critical issue for the parties, the Court, and the witnesses themselves to bear in mind is what the Seventh Circuit has described as the "difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). The former is prohibited; the latter is not.

### C. Crim's Motion to Exclude Expert Testimony of Peter Vrdolyak

Crim has moved to preclude Peter Vrdolyak, a member of VLG and Crim's former attorney, from opining in an expert capacity that various aspects of his conduct in dealing with CFS, Crim, and the disputed loan balance between CFS and Crim comported with the pertinent

standards of care and ethical practice in the legal community [231]. Crim contends that Vrdolyak is not qualified to render opinions on whether his conduct satisfied professional ethical standards. She also contends that Vrdolyak's testimony would be duplicative of that of VLG's ethics expert, George Collins, and that it would be unfairly prejudicial to her to "add weight to [Vrdolyak's] testimony by cloaking him with the mantle of 'expert.'" *Id.* at 6.

The Court grants the motion. Although Vrdolyak has more than two decades of experience as a successful trial lawyer, VLG has not demonstrated that he has any particular skill, experience, education, or training in the often specialized and complex matters of professional responsibility. See *Landeen v. PhoneBILLit, Inc.*, 519 F. Supp. 2d 844, 848 (S.D. Ind. 2007); *contra CDX Liquidating Trust ex. rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 586 (N.D. Ill. 2009) (permitting a law professor who specialized in corporate law to opine as to the fiduciary duties imposed upon boards of directors). Moreover, there has been no objection to VLG's other expert on legal ethics and professional responsibility, George Collins; VLG will have the benefit of Collins's testimony and opinions. The Court emphasizes that this ruling does not limit Vrdolyak's ability to offer testimony as to his personal experiences or other narrative facts that he perceived in the course of handling Crim's case or opinion testimony that accords with the strictures of Rule 701.

### D.     VLG's Motion to Exclude Certain Expert Testimony of Mary Robinson

VLG's twelfth motion in limine [228] seeks to exclude certain opinions of Crim's proffered ethics expert, Mary Robinson. VLG specifically seeks to exclude Robinson's opinion that VLG "breached its fiduciary duties of competence and loyalty to Debbie Crim by referring her to Client Funding Solutions Corp. ('CFS') without adequate investigation and without adequate disclosure to Crim of the reasons for recommending CFS and no other companies"

because whether VLG breached its fiduciary duty is a legal conclusion for the Court. VLG also contends that the evidence demonstrates that CFS's rates were in fact comparable to those of other similar lenders, such that Robinson should not be permitted to opine that Peter Vrdolyak's advice to that effect was misleading.

The Court grants in part and denies in part the motion. Opinions that amount to legal conclusions do not assist the trier of fact, and expert testimony that is "largely on purely legal matters and made up of solely legal conclusions" is not admissible. *Good Sheperd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); see also *CDX Liquidating Trust ex rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 587 (N.D. Ill. 2009) ("Expert testimony about the governing law is barred under Rule 403 because it would be a waste of time if witnesses or counsel should duplicate the judge's statement of the law, and it would intolerably confound the jury to have it stated differently. * * * [The proffered expert] cannot judge what Defendants did or did not do; nor whether they violated the law in that if he were to opine (and to explain how) their conduct constituted a breach of fiduciary duty, he would necessarily be deeming Plaintiff's version of the facts to be the credible account, which is prohibited. After all, the issue of whether Defendants breached their duties is an issue for the trier of fact to decide."). The motion is therefore granted to the extent that Robinson may not testify that any conduct by VLG or Peter Vrdolyak constituted a breach of fiduciary duty. Robinson may testify as to the professional and ethical obligations imposed on attorneys and may provide her take on the "concrete information" of record that the fact-finder may consider in drawing its own conclusions as to whether VLG or Peter Vrdolyak breached their fiduciary duties.

The motion is denied, however, to the extent that VLG seeks to preclude Robinson from

testifying that Vrdolyak's advice concerning CFS and its interest rates was misleading. Although there is some support in the evidence for VLG's position that CFS's rates were in fact among the lowest available to individuals like Crim, there is also evidence supporting Crim's position that the rates were not among the lowest. Moreover, the substance of Robinson's opinion is not that Vrdolyak's statement was incorrect but that it was misleading because he did not inform Crim what the general range of such interest rates was or explain why he referred her to CFS. Robinson may offer her opinion as to whether and how the statement was misleading.

### E.    VLG's Motions In Limine

#### 1.    No. 1:  Evidence as to Punitive Damages

VLG's first motion in limine seeks to prevent Crim from introducing evidence of or referring to punitive damages unless and until other evidence introduced establishes that she may be entitled to them. The Court denies this motion. Crim seeks punitive damages in connection with two of her four claims, and VLG does not contend that punitive damages are not permitted for the causes of action she asserts. See *supra* note 2. Instead, VLG asserts that Crim should be required to meet "some minimal evidentiary threshold" before being allowed to "present[ ] any evidence of punitive damages to the jury." [228] at 4-5. As VLG's submission of an Illinois pattern jury instruction on punitive damages suggests, the issue of whether punitive damages are supported by the evidence is properly handled at the jury instructions stage of the trial. Both parties will have the opportunity to propose jury instructions as to punitive damages, and the Court will instruct the jury in accordance with the evidence that is adduced at trial. *Cf. Polson v. Cottrell, Inc.*, 2007 WL 2409838, at *2 (S.D. Ill. Aug. 23, 2007) ("It is not a subject the Court feels compelled to prohibit anymore than it feels compelled to prohibit the Defendant from discussing possible defenses it later is precluded from instructing on because it has failed to

adduced evidence in support of.").  If the evidence adduced at trial in support of a punitive

damages claim is insufficient as a matter of law, the Court may decline to instruct the jury on

that claim or, alternatively, set aside any verdict that is entered without evidentiary support.

### 2.      No. 2:  Evidence of "Costs" and "Attorney's Fees"

In its second motion in limine, VLG "asks that [Crim] be prohibited from presenting any

evidence before the jury, with respect to costs or with regard to her attorney fees in connection

with this proceeding." [228] at 5-6. After Crim responded that "attorneys' fees and costs incurred

as a result of a defendant's breach of fiduciary duty may be awarded as a form of damages to

cure the damage caused by the breach," that "[a]ttorneys' fees may also be awarded as an

element of a punitive damages award," and that "some fees and costs may be awarded under 28

U.S.C. § 1927," [243] at 3-4, VLG clarified that it "does not object to the production of evidence

regarding the amount of fees Crim incurred from the date she retained her current counsel

through the entry of the Order regarding the disbursement of her funds following her settlement

with CFS." [248] at 2.

VLG appropriately conceded that Crim may admit evidence of the attorneys' fees that

she incurred in obtaining the order to disburse her settlement funds.  Illinois law provides that

"[a] plaintiff may recover the attorney fees expended in an effort to cure the damage caused by

the defendant, but may not recover fees expended in the action against the defendant." *Duignan

v. Lincoln Towers Ins. Agency, Inc.*, 667 N.E.2d 608, 613 (Ill. App. Ct. 1st Dist. 1996); *see also

Sorenson v. Fio Rito*, 413 N.E.2d 47, 51-52 (Ill. App. Ct. 1st Dist. 1980). To the extent that

VLG's motion in limine no. 2 sought to exclude this evidence, it is denied as moot in light of

VLG's concession.

VLG also has clarified that it "does not take issue with Crim's contention that the trial

court may consider, as one element of punitive damages, the amount of plaintiff's attorneys fees." [263] at 3. Illinois law supports this proposition, but does not appear to do so in such a way as to permit a jury to hear evidence of attorneys' fees incurred by the parties in litigating the claims before it. See, *e.g.*, *In re Estate of Talty*, 877 N.E.2d 1195, 1207 (Ill. App. Ct. 3d Dist. 2007); *Anvil Inv. Ltd. P'ship v. Thornhill Condominiums, Ltd.*, 407 N.E.2d 645, 654 (Ill. App. Ct. 1st Dist. 1980); *Glass v. Burkett*, 381 N.E.2d 821, 827 (Ill. App. Ct. 5th Dist. 1978); *Chi. Title & Trust Co. v. Walsh*, 340 N.E.2d 106, 115 (Ill. App. Ct. 1st Dist. 1975). Moreover, there is no evidence of attorneys' fees in the exhibits submitted, and Crim concedes that she has "deferred providing the bills." [243] at 4. Permitting her to do so now would prejudice VLG's ability to prepare a defense to these claims. Additionally, Crim has represented that "[t]he determination of the amount of fees can await the jury's verdict," and that she "will submit a petition with appropriate support." *Id.* Crim may do that. The remainder of this motion is granted as it relates to the presentation to the jury of any evidence concerning Crim's attorneys' fees in this action after she obtained the order to disburse her settlement funds.

### 3. No. 3: Damages Not Disclosed in Interrogatories

VLG next contends that Crim failed to disclose her pursuit of punitive damages in her answers to certain interrogatories and consequently should be "precluded from presenting any damage evidence which exceeds anything related in her sworn disclosures," such that "all evidence or argument regarding [punitive] damages should be barred." [228] at 7. Notwithstanding Crim's omission of punitive damages from her answers to VLG's second set of interrogatories, VLG has not provided any support for its suggestions that it was subsequently blindsided by Crim's continued pursuit of punitive damages or that it "reasonably assumed that Crim recognized that such claims were unwarranted and abandoned them." [248] at 3. Moreover,

the pretrial order sets forth Crim's claims for punitive damages as well as the amount she intends to seek, "three times the compensatory award or $600,000, whichever is greater." [230] at 5. The Court has no basis from which to conclude that VLG has not been accorded sufficient advance notice of Crim's punitive damages claims to adequately prepare its defense(s) to them. See *Hill v. City of Chi.*, 2011 WL 2637214, at *1 (N.D. Ill. July 6, 2011); *Abbott Labs. v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 771 (N.D. Ill. 2010). This motion is denied.

### 4. No. 4: "Disgorgement" and "Forfeiture" Evidence and Argument

In connection with her breach of fiduciary duty count, Crim seeks as relief the disgorgement or forfeiture of the $800,000 fee that she paid to VLG for representing her in her personal injury action. VLG's fourth motion in limine aims to prevent Crim from presenting to the jury any evidence pertaining to this type of relief "until threshold evidentiary proofs have been presented." [228] at 7. In light of the discussion above and the Court's ruling that the breach of fiduciary duty claim must be tried to the bench, the Court reserves ruling on this motion at this time and will discuss the presentation of evidence with the parties at the next status hearing.

### 5. No. 5: Damages Evidence as to Counts VII & VIII

VLG's fifth motion in limine seeks to prevent Crim from claiming as damages the full amount for which she settled her claim with CFS, $225,000, because she received and had full discretion over the use of $108,500 in loaned funds that she obtained from CFS. See [228] at 9-10. Crim responds that VLG is simply trying to relitigate issues resolved at summary judgment, [243] at 8, at which time she contended that she is entitled to claim the entire $225,000 as damages because she "would never have borrowed from Client Funding, but for VLG steering [her] to Client Funding." [209] at 10. The Court grants the motion.

As the Illinois Appellate Court has explained, "[c]ompensatory damages are those which are awarded to a person as compensation, indemnity or restitution for a wrong or injury sustained by him. The purpose of awarding compensatory damages is to make the injured party whole and restore him to the position he was in before the loss, but not to enable him to make a profit or windfall on the transaction." *Gambino v. Boulevard Mortg. Corp.*, 922 N.E.2d 380, 417 (Ill. App. Ct. 1st Dist. 2009) (citation omitted). Courts in this district have applied that general principle in cases involving breaches of fiduciary duty, see *U.S. Gypsum Co. v. Lafarge N. Am., Inc.*, 2009 WL 3871824, at *4 (N.D. Ill. Nov. 16, 2009) (citing *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997)), as have others. See *Interserve, Inc. v. Fusion Garage PTE, LTD*, 2010 WL 3339520, at *7 (N.D. Cal. Aug. 24, 2010).  If Crim were permitted to recover the principal that she received long ago (and presumably spent on living expenses) in addition to the interest that she alleges was improperly imposed upon her following VLG's referral, she would receive a substantial windfall and would be better off than she was when Vrdolyak recommended CFS to her in the first place. See *Ill. Sch. Dist. Agency v. Pac. Ins. Co. Ltd.*, 571 F.3d 611, 617 (7th Cir. 2009) ("The purpose of compensatory damages is to make the plaintiff whole," and "[t]he law aims to put an injured plaintiff in the same financial position that it would have been if the defendant had not breached its duty."). Crim does not dispute that she asked VLG for assistance in obtaining access to a loan.  Had she obtained a loan from a bank at the best available rate of interest, she still would have been liable for repayment of the principal, plus some interest. Crim may seek as damages no more than $116,500, the difference between the amount for which she settled the loans, $225,000, and the principal she received and benefited from, $108,500.  Both parties may present evidence at trial to establish the sum that would fairly compensate Plaintiff should the trier of fact determine that a breach of fiduciary

duty occurred.

**6.      No. 6:  VLG's Subsequent Referrals to CFS**

VLG's sixth motion in limine seeks to bar as irrelevant all evidence of VLG's referrals of clients to CFS after it first referred Crim there in 2005. See Fed. R. Evid. 401, 402. Crim contends that the referrals are relevant because VLG's "entire relationship" with CFS "and VLG's decision to value that relationship over Crim is at the core of this dispute." [243] at 9. The Court agrees and denies the motion. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," Fed. R. Evid. 401, and the existence of a continued relationship between VLG and CFS could make it more probable that VLG would breach its fiduciary duty to Crim and convert Crim's settlement proceeds. Indeed, VLG in its reply conceded that the referrals "may be relevant to Crim's theories" and offered to "stipulate that during the 2005-2009 time period it continually referred its clients to CFS." [248] at 5. It is Crim's decision whether to accept or reject this stipulation. See *Blue v. Int'l Bhd. of Elec. Workers Local Union 159*, 676 F.3d 579, 585 (7th Cir. 2012) ("Within the limits of Federal Rule of Evidence 403, Blue was entitled to make her case with the evidence of her own choosing." (citing *Old Chief v. United States*, 519 U.S. 172, 186-89 (1997))).

VLG also clarified that it "is looking to avoid having the trial in this matter unnecessarily prolonged by introducing evidence of unrelated, isolated loan transactions between VLG and any of its current or former clients, other than Crim." *Id.* This concern implicates Federal Rule of Evidence 403, not Rule 401 or 402. The Court is cognizant of the risk that such evidence could confuse the issues or mislead the jury. At this time, however, the Court is not persuaded to issue a blanket ruling that these risks outweigh the probative value of the evidence. VLG may make appropriate objections or seek curative instructions as may become necessary at trial. Should the

evidence in this area of possible inquiry become unnecessarily cumulative, the Court may exercise its discretion to direct Crim's attorneys to move on other subjects. See *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) ("Fed. R. Evid. 403 * * * allows the exclusion of evidence that is needlessly cumulative or will consume trial time out of proportion to its value."); *McDonough v. City of Quincy*, 452 F.3d 8, 20 (1st Cir. 2006) ("The ruling in question involved the court telling the City to 'move on' after counsel had asked McDonough several repetitive questions about his relationship with Captain Falco. Under Fed. R. Evid. 403, the district court retains discretion to 'prevent the needless presentation of cumulative evidence.' The court provided the City with ample opportunity to highlight McDonough's sour relationship with the City. It was within the court's discretion to draw the line where it did." (citation omitted)).

### 7. No. 7: Testimony & Evidence Regarding Dean Perozzi

VLG's seventh motion in limine seeks to bar evidence regarding and testimony by Dean Perozzi, a former client of VLG and CFS. VLG contends that Perozzi is "incredible" and has "an explicit animus" toward VLG. [228] at 12. VLG also contends that Perozzi's testimony is "marginally relevant, if at all." *Id.* Crim asserts that Perozzi's alleged bias can be addressed by VLG on cross-examination. See [243] at 10.

At this stage of the case, the Court agrees with Crim and accordingly denies the motion in limine to exclude Perozzi. "The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000); see also *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 307 (7th Cir. 2011) ("[E]vidence of a witness's bias or motive to lie is generally admissible for impeachment, and that bias is a particularly appropriate topic for cross-examination." (citation

26

omitted)). The Court notes that "[p]roffered bias evidence is subject to both the Federal Rules of Evidence and the discretion of the trial court," and "the trial court has considerable discretion as to how and when bias may be proved and as to what collateral evidence for purposes of impeachment is material." *Marcus & Millichap Inv. Servs.*, 639 F.3d at 307 (quotation omitted). Should VLG believe that evidence relating to Perozzi or testimony elicited from or Perozzi at trial is irrelevant or otherwise in violation of the Federal Rules of Evidence, it may make an appropriate objection. Again, should the Court conclude at some point during the examination of Mr. Perozzi that Crim's lawyers have belabored the point in such a fashion that the Rule 403 balance addressed above tilts toward exclusion, it will not hesitate to curtail the examination.

### 8.    No. 8:  References to Edward R. Vrdolyak

VLG's eighth motion in limine seeks "the entry of an order barring any reference to Edward R. Vrdolyak, unless it is first discussed with the court and is determined to have some bearing on relevant issues at trial." [228] at 13. The motion appears to be grounded in Federal Rules of Evidence 401, 402, and 403; VLG argues that "[a]ny focus or attempt to elicit or use the name Edward R. Vrdolyak in a fashion which could have no relevance to this case, could be intended to inflame or to improperly influence the jury." *Id.* Crim suggests that Edward R. Vrdolyak has "some relevance" to this case because "Crim originally retained Edward R. Vrdolyak and Edward R. Vrdolyak, Ltd. as counsel" in her underlying personal injury action. [243] at 11. She also points out that Exhibit No. 1 on VLG's exhibit list is the contingency agreement between Crim and Edward R. Vrdolyak, Ltd.

The Court is not persuaded that the limited connection between Edward Vrdolyak and this case set out above has more than a minimal tendency to make any consequential facts more or less probable. See Fed. R. Evid. 401. The Court also recognizes that the potential risk of unfair

prejudice to VLG could be substantial; although Edward R. Vrdolyak, a controversial figure in Chicago politics, is not a member of VLG, several members of the firm are relatives of his. At the end of the day, the balance between relevance and prejudice may well tip in VLG's favor. Yet the Court reserves ruling on the motion at this time, as it is not apparent how or even if Crim intends to reference Edward R. Vrdolyak beyond the contingency agreement that VLG offered as an exhibit. The Court will explore this subject further with counsel at the upcoming status hearing.

**9. No. 9: Exclusion of Witnesses from the Courtroom**

This motion is granted without objection as to fact witnesses. Fact witnesses – with the exception of Crim and one designated representative of VLG – will not be permitted to sit in on trial proceedings. See Fed. R. Evid. 615(a), (b). The exclusion of fact witnesses rests on a concern that having heard the testimony of others, the witnesses may inappropriately tailor their testimony to conform to the testimony of previous witnesses. *Geders v. United States*, 425 U.S. 80, 87 (1976); *Hill v. Porter Mem'l Hosp.*, 90 F.3d 220, 223 (7th Cir. 1996). No such danger is present with expert witnesses, whose testimony, by nature, is based on facts and information provided by others. Indeed, Federal Rule of Evidence 703 expressly provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," and the Seventh Circuit has noted that "there is little if any difference between counsel disclosing prior testimony to an expert and having an expert listen to such testimony in the courtroom." *United States v. Crabtree*, 979 F.2d 1261, 1270 (7th Cir. 1992). Accordingly, the motion is denied as to expert witnesses.

**10. No. 10: Certain References to CFS**

In this motion, VLG seeks to prevent Crim from referring to former party CFS in

pejorative terms such as "loan shark" and "predatory lender." [228] at 14. VLG contends that the use of these terms "with respect to a properly licensed business, conducting its business in full conformity with all laws, would be unfairly prejudicial to [VLG], and could be intended only to inflame or attempt to raise irrelevant passions of the jurors." *Id.* It requests that "[a]ny argument or testimony that attempts to impugn or to denigrate the operation of a licensed business," CFS, be barred. *Id.* at 14. The Court reserves ruling on this motion as well. The Court is cognizant of the potential prejudice that could inure to VLG if CFS is referred to in pejorative terms. There also is a risk of a distracting and unnecessary sideshow on the propriety of CFS's business practices, even though CFS has settled and no longer is a party to this case. But the Court need not rule definitively at this time, because VLG has not pointed to any actual use of such terms by Crim, her attorneys, or their proposed witnesses. This subject also will be explored further at the next status hearing.

### 11.     No. 11: The Conspiracy is the Conversion

In its eleventh motion in limine, which it acknowledges "may not exactly be a motion in limine," VLG contends that Crim's conversion and conspiracy claims are duplicative and indistinguishable. [228] at 15. VLG further argues that "[a]ny verdict on the Conversion claim will necessarily subsume any purported damage occasioned by a conspiracy," as "the only object of the alleged conspiracy in this case was the conversion of Ms. Crim's funds." *Id.* Crim retorts that this request "amounts to an unsupported motion to reconsider" VLG's unsuccessful motion for summary judgment on the conversion and conspiracy counts. [243] at 13. The Court disagrees, as this issue was not raised at summary judgment. Crim also argues that any concerns about double recovery "can be dealt with in the verdict form and jury instructions," that the "two claims are different and have different elements," and that her motion to for leave to amend

[232] aimed to "clarify that the damages sought for the claims is different." [243] at 13-14.

"The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's act. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). "A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Id.* "Thus, the gist of a conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." *Id.*

Here, the alleged tort underlying the alleged conspiracy is conversion of Crim's settlement proceeds by VLG. If Crim is able to prove that VLG converted her funds, the civil conspiracy claim adds nothing because it seeks relief only against VLG; CFS cannot be assessed liability for VLG's wrongdoing because it is no longer a party in the case. If, on the other hand, Crim cannot prove that VLG converted her funds, she will not have demonstrated the existence of the tort underlying the conspiracy and the conspiracy claim necessarily must fail. See *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1351 (Ill. 1997). Either way, the conspiracy claim carries no heft not already borne by the conversion claim. Crim purports to seek different relief for the two claims – "$87,304, representing 9% interest for the $970,060 in funds alleged to have been improperly held by VLG" for the conversion claim, [230] at 3, and "$225,000, representing the amount paid to Client Funding Solutions" for the conspiracy claim, *id.* at 4 – yet the request for $225,000 makes little sense given the underlying tort, and in any event appears to be duplicative of the relief requested in connection with the breach of fiduciary duty claim. All of these considerations suggest that it may not be appropriate to permit the conspiracy claim to be presented at trial. For the moment, however, the Court reserves ruling and will address this issue with the parties at the upcoming status conference.

**F.      Other Pretrial Issues**

Per their supplemental briefs, the parties consent to waive objections to scope on cross-examination so that witnesses need testify only once. The parties do not jointly consent to allow juror questions during trial, so no such questions will be permitted.

Dated: May 6, 2013

_____
Robert M. Dow, Jr.
United States District Judge