**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLIENT FUNDING SOLUTIONS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 10-cv-482 |
| | ) | |
| DEBBIE CRIM a/k/a DEBBIE CRIM CLARKE, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE VRDOLYAK LAW GROUP, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER INCORPORATING
## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## FOLLOWING BENCH TRIAL

In this diversity case, Third-Party Plaintiff Debbie Crim ("Plaintiff" or "Crim") alleged that her former lawyers, Third-Party Defendant The Vrdolyak Law Group ("VLG" or, for simplicity and consistency with the trial presentation, "Defendant"), converted her settlement funds, breached their fiduciary duties to her, and intentionally inflicted emotional distress upon her. The conversion and intentional infliction of emotional distress claims proceeded to a six-day jury trial, during which the Court and the jury heard the testimony of several witnesses, including Crim, Crim's former attorney Peter Vrdolyak ("Vrdolyak"), and Crim's treating psychologist Dr. Patricia Merriman. The jury found in favor of VLG on both claims. See [291].[1] The equitable breach of fiduciary duty claim was later presented to the Court in a one-day bench trial, see [296], during which the Court heard additional testimony from two legal

---

[1] The Court uses the following citation conventions: The Court encloses docket entries in brackets [#]. The Court refers to joint exhibits admitted at trial as "Joint #." The Court refers to Crim's exhibits admitted at trial as "Crim #." The Court refers to VLG's exhibits admitted at trial as "VLG #."

ethics experts, Mary Robinson (for Crim) and George Collins (for VLG).

The Court sets forth below its findings of fact and conclusions of law, as required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the documentary record in the case, the evidence and testimony presented at both phases of trial, and the parties' annotated proposed findings of fact submitted after trial. [307]; [308]. The Court treats as binding any factual findings necessarily made by the jury in its resolution of Crim's conversion and intentional infliction of emotional distress claims. *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 738 n.1 (7th Cir. 2004). The Court makes all independent factual findings by the preponderance of the evidence. To the extent that any finding of fact may be more properly characterized as a conclusion of law, it should be so construed. Similarly, to the extent that any conclusion of law may be more properly characterized as a finding of fact, it should be so construed.

After considering the admissible evidence and assessing the credibility of the witnesses, the Court finds and concludes that VLG owed Crim fiduciary duties but did not breach them. Accordingly, VLG is entitled to judgment on Crim's breach of fiduciary duty claim. The Clerk is directed to enter Rule 58 judgment in favor of VLG and against Crim on all counts tried.

## I.      Findings of Fact

Crim is a citizen of Florida who formerly resided in the Chicago area. See [308] ¶ 1; Tr. 4, 30, June 25, 2013. In January 2001, Crim was injured when the Metra commuter train in which she was riding struck a car. [307] ¶ 1; [308] ¶ 3. Crim retained VLG on a contingency basis to represent her in a personal injury action against Metra, Burlington Northern Santa Fe Railroad, and Jennifer DeBoer, the owner of the car that the train struck. [307] ¶ 2; [308] ¶ 4; Tr. 16, June 25, 2013. VLG is an Illinois limited liability corporation with three principals,

Vrdolyak and his brothers John and Eddie. [308] ¶ 2; Tr. 502-03, June 27, 2013. VLG has three offices, one of which is in the Chicago suburb of Tinley Park, Illinois. [308] ¶ 2. Vrdolyak was the partner in charge of the Tinley Park office. [308] ¶ 4; Tr. 575, June 27, 2013. Vrdolyak also was the VLG attorney primarily responsible for Crim's personal injury case. [308] ¶ 4.

Crim's injuries and subsequent medical and surgical procedures left her in significant pain, and she became unable to work in August 2002. See Tr. 18-19, 24, June 25, 2013; [308] ¶ 8. Crim borrowed approximately $160,000 from her siblings to cover her medical and living expenses while her personal injury lawsuit remained pending. [308] ¶ 7. Crim's family members eventually became unable to provide further financial assistance, and her medical and other bills continued to mount. See [308] ¶ 8.

In early 2005, Crim approached Vrdolyak and told him that she needed money. [307] ¶ 3; [308] ¶ 9; Tr. 30-31, June 25, 2013. Vrdolyak was aware that Crim was not employed and that her husband's employment was only sporadic. [308] ¶ 10. Vrdolyak also was aware that Crim already had borrowed money from her siblings and was in a "tough financial spot." *Id.* Crim likewise acknowledged that she was not at that time "in a position to qualify for any types of loans." [308] ¶ 9. Vrdolyak told Crim that he would not be able to personally loan her funds. See [308] ¶11. Lawyers are not permitted to loan money to their clients. Tr. 6, July 12, 2013.

Although he had no duty to do so, see Tr. 6, 75, July 12, 2013, Vrdolyak referred Crim to a litigation lending company, Client Funding Solutions ("CFS"). [307] ¶ 4; [308] ¶ 11. Like all litigation lending companies, CFS made high-interest-rate loans available to litigants to whom regular sources of credit were not available. [308] ¶¶ 17-18, 20. CFS typically lent money at interest rates between 45% and 60%. [308] ¶ 36. These rates were competitive in the Chicago market. [308] ¶ 36; Tr. 817-18, June 28, 2013; Tr. 935, July 1, 2013. CFS was at all relevant

times licensed and regulated by the State of Illinois.  See [308] ¶ 21; Tr. 807-08, June 28, 2013.

It did business with approximately 700-1000 law firms within the state.  [308] ¶ 23.

Vrdolyak did not give Crim the names of any other litigation lenders, [307] ¶ 5, though

he was aware of others in the Chicago area.  Tr. 566, June 27, 2013; Tr. 934-35, July 1, 2013.

Vrdolyak told Crim that his brother Eddie knew the principals of CFS, Miles Lustig and Wayne

Cohen, and Eddie had told Vrdolyak that Lustig and Cohen were "good guys."  [308] ¶ 12; Tr.

34, June 25, 2013; Tr. 566, June 27, 2013. Vrdolyak had limited personal knowledge of Lustig

and Cohen, see Tr. 32, 34, June 25, 2013, but was familiar with them generally and had

interacted socially with them at events like Christmas parties and basketball games.  Tr. 568,

585, 605, June 27, 2013; Tr. 755, June 28, 2013.  The standard of care for attorneys permits them

to rely on the investigations and recommendations of their law partners.  [308] ¶¶ 14-15.

Vrdolyak personally referred 8-10 clients to CFS over the span of about eight years.  [308] ¶ 24.

One of those clients, Dean Perozzi, complained to Vrdolyak about CFS's interest rates in 2006,

after Vrdolyak already had referred Crim there.  [307] ¶ 10.  Neither Vrdolyak nor VLG ever

received any kind of remuneration from CFS for referring Crim or any other client to CFS.  [308]

¶ 130.

Crim contacted CFS in late February 2005.  Tr. 34, June 25, 2013; Tr. 748, June 28,

2013.  After signing three loan documents, see VLG 31, Crim obtained a $25,000 loan on

February 28, 2005.  See Crim 5, 6; VLG 8.  The loan documents were a Demand Promissory

Note, a Letter of Direction, and a document entitled "Representations, Warranties and Covenants

from Borrower to Lender" ("Representations").  See VLG 31.  The Note disclosed that the loan

carried an annual percentage rate of 60% but did not disclose that the loan was non-recourse.

See *id.*; Tr. 751, June 28, 2013.  The Letter of Direction directed Vrdolyak or "any subsequent

attorney who handles" Crim's case to repay CFS the principal plus any accrued interest upon receipt of any settlement check. VLG 31. The Representations "irrevocably authorize[d] Lender [CFS] to contact the attorney representing Borrower [Crim] representing Borrower in connection with the Claim in order for Lender to receive periodic status reports on the Claim and Lender shall be entitled to receive all documents and reports that the attorney may have that are not covered by any privilege recognized under Illinois law." VLG 31. Crim signed the loan documents without reading them carefully. Tr. 37, June 25, 2013; Tr. 312-13, June 26, 2013. She did not ask Vrdolyak to review the loan documents before she signed them. [308] ¶ 26. Nor did Crim ask Lustig to speak with Vrdolyak before she signed the documents. [308] ¶ 27.

CFS sent a copy of the executed loan documents to VLG, Crim 5, and later sent a letter advising Vrdolyak that Crim had obtained a $25,000 loan. Crim 6; VLG 29. Vrdolyak did not see or review the loan documents until after Crim signed them. [308] ¶ 28. The loan documents were sent to him by Lustig, not Crim. Tr. 508-09, June 27, 2013. Vrdolyak never talked with Crim about representing her in connection with the loans. [308] ¶ 28.

Crim turned to Lustig several more times when she needed money. Crim negotiated her loans directly with CFS and received both the loan documents and the advances from CFS. [308] ¶ 29. Crim received the following cash disbursements on the following dates:

| Loan Date | Cash Disbursed |
|---|---|
| February 28, 2005 | $25,000 |
| July 21, 2005 | $8,500 |
| August 1, 2005 | $6,500 |
| April 13, 2006 | $3,500 |

| | |
|---|---|
| January 10, 2008 | $12,500 |
| August 20, 2008 | $20,000 |
| December 24, 2008 | $7,500 |
| January 30, 2009 | $3,500 |
| March 26, 2009 | $7,500 |
| July 13, 2009 | $7,500 |
| September 25, 2009 | $6,500 |
| TOTAL | $108,500 |

See [307] ¶ 13; [308] ¶ 25; Crim 37; VLG 8.  CFS was the lender for all but the August 1, 2005 loan; for reasons that remain unclear even after trial, W&M Trading Corp., another entity owned by Lustig and Cohen, made the August 1, 2005 loan.  See VLG 8; VLG 31; Tr. 855, June 28, 2013.   All told, Crim received $108,500 in cash from CFS (and W&M Trading).  Both Lustig and Vrdolyak credibly testified that this was an unusually high amount.  Tr. 812, 830 June 28, 2013; Tr. 967-68, July 1, 2013.

Each time that she needed money, Crim contacted CFS and executed loan documents.  [308] ¶ 30; see VLG 31.  As with the first loan, Crim signed all subsequent loan documents without reading them carefully and did not ask Vrdolyak or anyone else at VLG to review them before she signed them.  Tr. 37, June 25, 2013; Tr. 312-13, June 26, 2013.  Lustig sent copies of all of the executed loan documents to VLG.  [308] ¶¶ 26, 28, 31.   Vrdolyak was aware of the provisions of the Letters of Direction, which authorized and directed him to communicate with CFS regarding the progress and status of Crim's personal injury suit and to pay CFS once the lawsuit was resolved. [308] ¶ 34.

The Letter of Direction and Representations were substantially identical for each loan.

See VLG 31; Tr. 813, June 28, 2013. The terms of the Note, however, varied slightly. Where the first Note had indicated that Crim had "financed" $25,000 – the amount of cash she received – the second Note listed the "amount financed" as $39,376.71. See VLG 31. This number comprised the $25,000 first loan, plus the interest it had already accrued, plus the additional $8,500 in cash Crim received upon signing and returning the loan documents. Tr. 800, 805-06, June 28, 2013; [308] ¶ 116. Essentially, CFS treated the second loan as a continuation of the first rather than as a separate loan, and so on with subsequent loans. Tr. 806, June 28, 2013. The first five loans had an interest rate of 60% and were treated as a single loan in this fashion. [308] ¶ 37; Tr. 805-06, June 28, 2013. The last six were treated as a second, single loan that had an interest rate of 45%; Crim negotiated the lower rate with Lustig herself. [308] ¶ 37; Joint 15; Tr. 824, 832, June 28, 2013. Crim did not ask Lustig to explain how CFS calculated its numbers or consolidated her loans. Tr. 311, June 26, 2013. Lustig testified credibly that he explained the rolling interest to her and answered all of the questions that she asked about the loans. Tr. 800-01, 807, June 28, 2013.

In late September 2009, Crim settled her personal injury claims against Jennifer DeBoer for $2,400,000. [308] ¶ 40; Tr. 46-47, June 26, 2013; Tr. 524-25, June 27, 2013; VLG 4. At the time that she agreed to the settlement, neither Crim nor Vrdolyak knew the precise amounts that Crim owed to CFS or her other creditors. Tr. 300, June 26, 2013; Tr. 574-75, June 27, 2013; see also Crim 40. Crim requested an advance from the settlement in late October 2009. [308] ¶ 41. After obtaining from Crim a power of attorney, Vrdolyak advanced Crim $9,500. See *id.*; Joint 1; VLG 7. Approximately one month later, in November 2009, Crim requested and received a second advance of $6,500. [308] ¶ 43.

VLG apprised CFS of the settlement at some point in November or December 2009, prior

to VLG's receipt of the funds. Tr. 774, 821, June 28, 2013. On December 2, 2009, Lustig sent an e-mail to Vrdolyak outlining the total amount due to CFS as of December 21, 2009, a date by which Vrdolyak believed the settlement funds would be available for disbursement. See [308] ¶ 44; Tr. 822-24, June 28, 2013; Joint 3. This e-mail marked the first time that Vrdolyak was aware of Crim's precise loan balances with CFS. [308] ¶ 54. The first page of the attachment to the e-mail calculated that Crim owed $334,881.13 on the group of loans taken out at 60% interest. Joint 3. It broke this number down into the "Balance On 1/8/2008," $154,177.11, and the "Interest Owing Thru 12/21/2009," $180,704.02. *Id.* The attachment was structured like a letter, and the date "Tuesday, January 08, 2008" – the same date as the "Balance On" date in the body of the document – was in the address block at the top. *Id.* At the bottom, however, were a URL and date stamp that Lustig credibly testified were placed there automatically by the computer program that he used to generate the document at the time that he generated the document. *Id.*; Tr. 825-27, June 28, 2013; [308] ¶ 47. This automatic date stamp read "12/2/2009," the date of the email. Joint 3. The second page of the attachment also bore an automatic date stamp of "12/2/2009." Joint 3. Accordingly, the Court finds that both pages of the attachment were prepared on December 2, 2009 notwithstanding the address blocks at the top. The second page calculated that Crim owed $78,617.08 on the second group of loans. *Id.* Like the number on the first page, this number was broken down into two parts: "Balance On 9/23/2009," $70,843.69, and "Interest Owing Thru 12/21/2009," $7,773.39. *Id.* The second page also was structured like a letter; the date "Wednesday, September 23, 2009" was in the address block at the top. *Id.* The total amount that Lustig believed that Crim owed was $413,498.21. [308] ¶ 46.

Vrdolyak forwarded the e-mail and attachments from Lustig to Crim on the morning of

December 3, 2009. [308] ¶ 48; Crim 40; Crim 43. That afternoon, Vrdolyak informed Crim that he had requested from Lustig copies of all of the loan documents Crim had signed. Crim 43. Vrdolyak told Crim that he would forward the documents to Crim for her review when he received them. Crim 43. Vrdolyak also told Crim that he would "have a CPA check the computations and get back" to her. *Id.*

Crim responded to Vrdolyak late that evening. Crim 40. Crim believed that the attachments to the December 2, 2009 e-mail were in fact letters that Lustig created on January 8, 2008 and September 23, 2009, and that Vrdolyak had concealed the letters and Lustig's calculations from her. See *id.*; Tr. 355, June 26, 2013. Crim informed Vrdolyak that she "object[ed]" to Lustig's calculations and claimed amount due. Crim 40. She also claimed to have questioned Vrdolyak repeatedly about the loans. [308] ¶ 51; Crim 40. The Court finds more credible Vrdolyak's testimony to the contrary, see [308] ¶ 52; Tr. 962-63, July 1, 2013, particularly in light of the absence from the trial record the purported e-mails in which these questions were raised. See Crim 40; [308] ¶ 50.

On or about December 15, 2009, VLG received three settlement checks dated December 9, 2009 from Safeco Insurance Company, DeBoer's insurer. [308] ¶ 56; Tr. 952-54, July 1, 2013; Crim 94; VLG 27. VLG deposited the checks in VLG's client trust fund account. Tr. 966, July 1, 2013. VLG prepared and issued to Crim a "settlement statement" listing the amount of the settlement, the various deductions that would be taken therefrom, and the net amount that she would receive. Crim 44. The settlement statement indicated that Crim owed CFS $411,453.51. Crim 44; [308] ¶ 57. Crim and Lustig negotiated an approximately $25,000 reduction in the amount due to CFS. Vrdolyak was not involved in these discussions. [308] ¶ 55. After the reduction, Crim orally agreed to pay CFS approximately $386,000. Tr. 477-78, June 27, 2013;

Crim 94. Crim advised Vrdolyak of the reduction on December 15, 2009, and directed him to pay CFS approximately $386,000. [308] ¶ 57. At some point around this time Vrdolyak prepared an updated settlement statement reflecting the reduced amount owed to CFS. Crim 94.

On December 15, 2009, Vrdolyak wrote several checks on VLG's client fund account. See VLG 27; Tr. 966, July 1, 2013. The checks were payable to Crim's creditors in the amounts set forth on the updated settlement statement. See VLG 27; Crim 94. Among them were a check payable to CFS in the amount of $386,453.51 and two checks payable to Crim in the amounts of $15,000 and $980,060.73. See VLG 27. Crim's funds were divided into two portions because Crim requested that Vrdolyak give her $15,000 immediately and hold onto the remainder while she decided what she wanted to do with it. [308] ¶¶ 59-60; see also Joint 4; VLG 7.

That same day, after Vrdolyak prepared the checks, someone at VLG contacted Lustig to advise him that the check for CFS was ready. [308] ¶ 62. While Lustig was on his way to get the check, Crim began to have second thoughts about agreeing to pay CFS the agreed-upon $386,453.51 without conducting a further audit of CFS's figures and calculations. Crim telephoned Vrdolyak and directed him not to release CFS's check until she was able to audit the figures and calculations. [308] ¶ 64. Crim authorized Vrdolyak to release the checks to all her other creditors, but rescinded his authorization to do anything else with regard to the settlement funds or the still-ongoing negotiations with Metra and BNSF. See Joint 4. Crim later sent Vrdolyak an e-mail confirming these oral directives. See Crim 45; Joint 4. Vrdolyak believed that Crim's desire to check the numbers was reasonable. [308] ¶ 73. Crim did not tell Vrdolyak that she was not going to pay, and Vrdolyak did not believe that Crim planned to not pay CFS. [308] ¶ 85.

Immediately after Crim directed him not to release the check to CFS, Vrdolyak called

Lustig. [308] ¶ 71. Vrdolyak told Lustig that he could not release the check to him because Crim wanted to double-check the numbers. [307] ¶ 42; [308] ¶ 71. Vrdolyak did not provide Lustig with any further information. [308] ¶ 72. Even if Crim's desire to check the numbers was confidential, it would have been appropriate for Vrdolyak to disclose it if he reasonably believed that by doing so he was advancing her interests. [308] ¶¶ 66-67. Based on the testimony at trial, the Court finds that Vrdolyak reasonably held that belief.

Vrdolyak complied with Crim's request and did not release the check to Lustig. Tr. 779, June 28, 2013; Joint 4. Lustig became upset and immediately contacted Cohen and his lawyer to inform them about Crim's change of heart. [308] ¶ 74. Lustig decided to file a lawsuit against Crim to recover the money "the moment [he] walked out of Peter's office." [308] ¶ 75; Tr. 786, June 28, 2013. Lustig did not inform Crim or Vrdolyak that he intended to pursue legal action to ensure that CFS was paid. See Tr. 787-88, June 28, 2013; [308] ¶ 84.

The balance of Crim's settlement funds – the $980,060.73 – remained available for Crim to pick up from Vrdolyak [308] ¶ 82. Crim did not pick up the funds, nor did she authorize Vrdolyak to release the funds to her or anyone else. See Tr. 688-89, June 28, 2013.

Later in December, Vrdolyak left town to attend a family holiday gathering in Michigan. See Tr. 976, July 1, 2013. He consequently was out of the office on December 23, 2009, and did not receive notice on that day that CFS filed a Complaint for Breach of Contract & Attachment against Crim in the Circuit Court of Cook County. [307] ¶ 44; [308] ¶ 83; Crim 90. The complaint alleged that CFS "has been informed of the anticipatory breach of said loan agreement and that Crim has instructed Mr. Vrdolyak to not honor her prior direction to pay CLIENT FUNDING SOLUTIONS CORP." Crim 90. The complaint further alleged that Crim lived in Florida and that CFS "believes that Crim is about to fraudulently conceal, assign or otherwise

dispose of her property or effects so as to hinder or delay her creditors." *Id.*; see also [307] ¶¶ 45-46; [308] ¶ 83. These allegations track the language of 735 ILCS 5/4-101.

CFS also filed contemporaneously with the complaint a motion for an order of attachment. Joint 5. CFS noticed the motion for the next morning, December 24, 2009, at 10:00 a.m. *Id.* Vrdolyak was identified in the motion as a "garnishee." *Id.*; [308] ¶ 86. A copy of the complaint and motion were sent to VLG's Tinley Park office, but the office was leanly staffed in light of the upcoming holiday and no one informed Vrdolyak that he had received these documents. Tr. 601, June 27, 2013; [307] ¶ 57. Lustig did not call or otherwise contact Vrdolyak to inform him that the suit had been filed. [308] ¶ 84. Likewise, no one at VLG informed Crim that she had been named in the suit. Tr. 123, June 25, 2013. The Court finds that neither Crim, who was in Florida, nor Vrdolyak, who was in Michigan, was aware of the complaint or pending motion on December 23 or December 24, 2009.

On December 24, 2009, Vrdolyak sent Crim an e-mail from Michigan. Tr. 688, June 28, 2013; Joint 6. He credibly testified that he sent the e-mail on that day "because I hadn't heard from her in nine days. I was holding her money for nine days from December 15th to 12-24 waiting for her to verify Miles' numbers. I was ready to give her her money on 12-15, had the check cut to her. She asked me to hold her money and only give her 15,000, which I did, and I hadn't heard from her in nine days as to whether she had talked to a financial adviser, whether she had worked out the numbers, and I hadn't heard from her and I'm holding all this money for her and I wanted to know where she had come in the process. I was ready to give her her money." Tr. 688-89, June 28, 2013. In the e-mail, Vrdolyak wrote, "Have you decided on what you would like me to do with the settlement proceeds? Have you spoken with a financial advisor? Have you completed the audit with regard to client funding? Please advise at your

earliest convenience.  I will be out of the office until 12/28 but will be attending court in your matter that morning."  Joint 6.  The Court finds credible Vrdolyak's testimony that he was unaware of the CFS lawsuit and motion at the time he sent this e-mail.

Crim fell ill during the holidays and did not check her e-mail until December 27, 2009. Tr. 266, June 26, 2013; Joint 7.  She responded to Vrdolyak's December 24, 2009 e-mail at about 9:30 p.m on December 27.  See Joint 7.  In her response, Crim instructed Vrdolyak to send her via overnight mail a check for the remaining settlement proceeds due to her.  Joint 7; [307] ¶ 48; [308] ¶ 88.  Crim attached to the e-mail an unsigned and undated letter of direction echoing the request and further requesting that Vrdolyak place the disputed $386,453.51 in escrow.  See Joint 7; Tr. 977, July 1, 2013.

Vrdolyak was still in Michigan with his family when he opened and read Crim's e-mail on December 28, 2009.  [307] ¶ 50; [308] ¶ 89.  He was not able to comply with Crim's instructions to distribute the settlement funds because he was not in the office and lacked access to necessary documents.  [308] ¶ 91.  Vrdolyak did not personally respond to Crim's e-mail.  Tr. 687, June 28, 2013.  Vrdolyak instead instructed one of his colleagues, Tom Murphy, to call Crim.  *Id.*; Tr. 978, July 1, 2013.  There is no evidence in the record regarding the contents of that conversation.

Sometime after December 28, 2009, the Broward County Sheriff served Crim with CFS's complaint against her.  [307] ¶ 60.  This is when Crim first learned that she had been sued.  See *id.*

On December 29, 2009, CFS appeared in the Cook County Circuit Court and obtained an Order for Attachment and Summons ("Attachment Order").  [308] ¶ 93; VLG 10.  The "amount claimed" at the top of the order was $413,838.99 plus $340.78 per diem in costs."  [308] ¶ 94;

VLG 10. The Attachment Order described the property to be attached as "settlement proceeds of Cook County Case Number 2001M6-6170, case entitled Clark Debbie Crim vs. Deboer Jennifer S., et al." VLG 10. The Attachment Order directed the Sheriff to summon Crim to appear for a hearing date of January 29, 2010, "or at his/her option, to appear at any time prior thereto and move the court to set a hearing on this Order for Attachment or affidavit"; Vrdolyak was also summoned to appear as a garnishee. *Id.* Counsel for CFS faxed the Attachment Order to Vrdolyak's office on December 29, 2009. Joint 8. Vrdolyak saw the order for the first time on December 30, 2009, when he returned to his office after the holidays. Tr. 696, June 28, 2013; Tr. 980, July 1, 2013.

Vrdolyak interpreted the Attachment Order to mean that all of Crim's settlement proceeds, not just the money earmarked for CFS, had to remain in escrow. Tr. 703, 716, 732, June 28, 2013; [308] ¶ 95. He reached that conclusion after reading the order himself, discussing it with another lawyer in his office, and discussing it with the lawyer on the opposing side of the case. Tr. 703, June 28, 2013; Tr. 980, July 1, 2013.

Vrdolyak e-mailed the Attachment Order to Crim on December 30, 2009. See Crim 52. On December 31, 2009, Crim sent Vrdolyak an e-mail in response. *Id.* Crim's e-mail stated that the Attachment Order "ha[d] [her] very concerned." *Id.* She told Vrdolyak that she was "sick about this," said that "[t]his needs immediate action," and implored Vrdolyak to "please help me." *Id.*

Vrdolyak did not understand Crim's request for "immediate action" as a directive to go to Cook County Circuit Court and attempt to release her settlement funds. See Tr. 691-92, June 28, 2013. Vrdolyak conceded that going to court would be "one of the options," but he did not believe that doing so would be the best course of action at that time. Tr. 691-92, 699, June 28,

2013; [308] ¶ 101. Vrdolyak believed that a more prudent legal strategy would be to attempt to resolve the entire matter prior to the scheduled hearing date of January 29, 2010. Tr. 692-93, June 28, 2013; [308] ¶ 102; Joint 9. The Court finds that this belief was an objectively reasonable one. See [308] ¶ 124. Vrdolyak credibly testified that his strategy was driven by his desire to try to resolve the entire case before the next court date. Tr. 699, June 28, 2013. Vrdolyak advised Crim that if she needed money before the scheduled January 29, 2010 court date, he would be willing to advance her some. [308] ¶ 99.

While Vrdolyak was attempting to negotiate with CFS to resolve the case, Crim was attempting to confirm CFS's numbers. After she changed her mind about releasing the check to CFS on December 15, 2009, Crim reached out to her friend Dale Randle and her husband's cousin Debra Clements to help her calculate the amount that she owed. Tr. 107-08, June 25, 2013; [307] ¶ 25. Crim also corresponded directly with Lustig, who sent her the loan documents, provided a breakdown of the loans, and explained that "interest * * * was added to the loan each time money was received." Joint 10. Crim sent Randle and Clements copies of the loan documents, but neither one of them could figure out how CFS arrived at the $413,000 figure. [307] ¶¶ 26-27. Crim directed Lustig to communicate directly with Clements. Joint 10. At some point Clements also began corresponding with Vrdolyak. On January 1, 2010, Vrdolyak sent Clements an e-mail in which he reiterated his offer "to have an accountant review the docs in order to determine the accuracy of the final figure * * * at no charge to Debbie." Joint 9. He continued, "I strongly advise that this matter with client funding be resolved as soon as possible. The longer this matter lingers, the longer that Debbie's money is tied up and the interest on the loans continues to accrue. Let me know what docs you need and whether I should have an accountant review the docs." *Id.*

Vrdolyak had ongoing conversations with Crim, Clements, and Lustig regarding Crim's desire to have the loan documents reviewed. [308] ¶ 96. On January 6 2010, Vrdolyak asked Lustig to forward Crim's loan documents to Kevin Pierce, an accountant who previously had been employed by Vrdolyak and at the time worked for Vrdolyak's cousin. Tr. 702, June 28, 2013; Joint 11; Joint 12; VLG 19. Pierce, a CPA, agreed to review the figures at no charge to Crim. Tr. 702, June 28, 2013. Pierce was able to navigate the loan documents and concluded that Crim actually owed slightly more than CFS was requesting. Tr. 713, June 28, 2013; [307] ¶ 32; Joint 15. Crim's friend Randle eventually reached the opposite conclusion, but Crim did not forward his calculations to either Vrdolyak or Lustig. [308] ¶¶ 97-98.

At some point Clements reviewed Pierce's calculations. See Joint 16. She e-mailed Vrdolyak on January 12, 2010 to ask for more details. *Id.* Vrdolyak responded to Clements – and copied Crim – on January 14, 2010. *Id.* He advised Clements that he could "file a motion to amend the judge's order and request that my office be allowed to release some of the settlement proceeds to Debbie." *Id.*; see also [308] ¶ 111. Vrdolyak further explained that "a couple things need to be considered" before filing such a motion, including the danger of alienating CFS to the point that it would no longer be willing to negotiate the loan balance. Joint 16; [308] ¶ 111. He asked Clements to "discuss with Debbie and Lee [Crim's husband] and get back to [him] asap." *Id.*

Vrdolyak did not get a response. See Joint 18. On January 19, 2010, he called Crim and asked her to call him back at her earliest convenience. *Id.*

Crim did not call Vrdolyak back. Instead, Crim terminated VLG on January 22, 2010. [308] ¶ 126. Crim's new counsel removed the suit to this Court on January 25, 2010. [308] ¶ 127. On January 29, 2010, this Court entered an Agreed Order pursuant to which VLG was to

deposit $550,000.00 of Crim's settlement funds with the Clerk of Court and to wire transfer the remaining $816,514.24 to Crim. *Id.*; [19]. January 29, 2010 also was the date on which the Cook County Circuit Court hearing had been scheduled to take place. [308] ¶ 128.

## II.  Conclusions of Law

To succeed on a breach of fiduciary duty claim, a plaintiff must prove three things: (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) damages proximately resulting from that breach. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000); see also *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006). A fiduciary duty may arise either as a matter of law or by special circumstances. *Autotech*, 471 F.3d at 748 (citing *Crichton v. Golden Rule Ins. Co.*, 832 N.E.2d 843, 854 (Ill. App. Ct. 5th Dist. 2005)). The attorney-client relationship is a fiduciary relationship as a matter of law. *Evanston Ins. Co. v. Riseborough*, --- N.E.3d ---, 2014 WL 688144, at *12 (Ill. Feb. 21, 2014); *In re Imming*, 545 N.E.2d 715, 721 (Ill. 1989). The Court accordingly concludes that a fiduciary relationship existed between Crim and VLG, her attorneys, from the inception of their attorney-client relationship through its termination on January 22, 2010.

"[T]he attorney-client relationship gives rise to certain duties owed by the attorney to the client without regard to the specific terms of any contract of engagement. Among the fiduciary duties imposed upon an attorney are those of fidelity, honesty, and good faith, both in the discharge of contractual obligations to, and professional dealings with, a client. When, in the course of his professional dealings with a client, an attorney places personal interests above the interests of the client, the attorney is in breach of fiduciary duty by reason of the conflict." *Doe v. Roe*, 681 N.E.2d 640, 645 (Ill. App. Ct. 1st Dist. 1997). Fiduciary duties are distinct from those imposed by professional standards "in that the relevant standard of care in a negligence claim

encompasses a broader range of conduct than is covered by a fiduciary duty and that a negligence claim for legal malpractice is based in tort, while a claim for breach of fiduciary duty is founded on principles of agency, contract, and equity." *Pippen v. Pedersen & Houpt*, 986 N.E.2d 697, 706 (Ill. App. Ct. 1st Dist. 2013). However, "when such claims are supported by the same operative facts and result in the same injury to the plaintiff, the breach of fiduciary duty claim is duplicative of the malpractice claim." *Pippen*, 986 N.E.2d at 704. Accordingly, the Court's analysis is informed by concepts and standards pertaining to professional negligence. The Court notes that "[i]n Illinois, the established standard of care for all professionals is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under the circumstances." *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1020 (Ill. 1996).

Crim alleged in her operative complaint that VLG breached its fiduciary duties by:

- failing to disclose its relationship with CFS, W&M, Lustig, and Cohen;

- intentionally revealing confidential information to CFS, which led CFS to file suit against Crim and allege that she intended to abscond with the settlement funds;

- failing to immediately inform Crim that CFS had filed suit against her;

- delaying the distribution of Crim's settlement funds until CFS was able to obtain an order of attachment;

- deliberately misreading the Attachment Order and refusing to distribute any funds to Crim;
- engaging a relative's employee as a purported independent accountant; and

- telling Crim that the loans were valid and that she must pay CFS to obtain access to any of her settlement funds.

[140] ¶ 166.  Crim's annotated proposed findings of fact indicate that she altered her theories as the case developed.  In her annotated proposed findings of fact, Crim alleges that Vrdolyak breached his fiduciary duties to her by:

- prompting her to borrow money without providing her with other options;

- pushing her to repay CFS despite "everyone's inability to compute the loan repayment amount";

- refusing to provide Crim with her loan payoff numbers in advance of her September 2009 mediation;

- communicating with Lustig about Crim;

- refusing to give Crim her settlement check; and

- intentionally failing to go to state court to help Crim get her money.

See [307].

In the interest of completeness, the Court considers whether Crim proved that any of the conduct alleged either in her operative complaint or her annotated findings of fact constituted a breach of fiduciary duty. The Court groups the allegations topically.

### A.      Referral to CFS

Crim alleges that VLG (through Vrdolyak) breached its fiduciary duties to her when it referred her to CFS exclusively and did so without informing Crim about purported relationships among VLG, CFS, and CFS's principals. The Court concludes that no breach occurred at the time VLG referred Crim to CFS.

Despite being given wide latitude in discovery, Crim did not come forward with any evidence demonstrating any sort of financial relationship between VLG and CFS. Both Lustig and Vrdolyak credibly testified that VLG did not receive any benefit in exchange for referring clients to VLG, see Tr. 836, June 28, 2013; Tr. 938-39, July 1, 2013, and Crim did not present any evidence to the contrary. Because the evidence revealed no financial or other improper relationship between CFS and VLG, VLG could not have violated fiduciary duties by failing to disclose a relationship to Crim. Moreover, the evidence showed that Vrdolyak truthfully told

Crim that he did not know CFS or its principals well.

The Court also concludes that VLG did not breach any duties by giving Crim the name of a single litigation lender. The legal ethics experts who testified agreed that a lawyer does not have a professional obligation to refer a client to a litigation lender or provide financial advice. Tr. 6, 75-76, July 12, 2013. However, if a lawyer chooses to make a referral, he must do so competently and with loyalty to his client. Tr. 7, July 12, 2013. The Court concludes that Vrdolyak satisfied those standards here. He testified that he thought "it would be better to send her to somebody that we knew, that my brother knew than to send her to somebody that we didn't know," Tr. 567, June 28, 2013, indicating that he had Crim's interests in mind when he referred her to CFS. As to the duty to perform competently, evidence at trial demonstrated that the standard of care applicable to attorneys permits them to rely on the investigations and recommendations of their law partners. [308] ¶¶ 14-15. Vrdolyak acted within that standard here. There is no evidence in the record that he told Crim that CFS was her only option, and the Court does not find credible Crim's testimony that Vrdolyak told her that CFS had the "cheapest" interest rates. Tr. 39, June 25, 2013. Additionally, there is no evidence that Crim asked Vrdolyak for more information about CFS or did any investigation on her own before choosing CFS. Perhaps it would have been preferable for VLG to have provided Crim with the name of more than one litigation lender, but Vrdolyak's failure to do so on this occasion did not constitute a breach of his fiduciary duty to Crim. There is no basis in the record for concluding either that CFS's interest rates of 45-60% were materially different from the rates charged by others in the market for high-risk clients like Crim or that Crim's financial situation would have allowed her access to cheaper credit.

### B. Communication with CFS

Lawyers have a duty to maintain the confidentiality of client information. Rule 1.6 of the Illinois Rules of Professional Conduct "encompasses the attorney-client evidentiary privilege as well as the attorney's fiduciary duty to his client." *Profit Mgmt. Dev., Inc. v. Jacobson, Brandvik & Anderson, Ltd.*, 721 N.E.2d 826, 835 (Ill. App. Ct. 2d Dist. 1999). The version of Rule 1.6 in effect at the time of the incidents in this case provided in pertinent part that "a lawyer shall not, during or after termination of the professional relationship with the client, use or reveal a confidence or secret of the client known to the lawyer unless the client consents after disclosure." 1990 Rules Governing the Legal Profession and Judiciary in Illinois, *available at* http://www.iardc.org/rulesprofconduct.html. Crim alleges that VLG breached its duty of confidentiality to her by communicating to Lustig her desire to verify the loan numbers and her alleged intent to abscond with the settlement funds. The Court disagrees on both points.

Although the text of Rule 1.6 did not expressly provide that information could be disclosed with "implied authorization" or "when the lawyer reasonably believes that doing so would advance the interests of the client in the representation," expert George Collins testified to the former, Tr. 80, July 12, 2013, and expert Mary Robinson testified to the latter. Tr. 66, July 12, 2013. The Court concludes that either or both of these conditions were satisfied as to Crim's desire to check the numbers. To the extent that Vrdolyak was not formally or expressly authorized to disclose information about Crim's desire to check the numbers pursuant to the loan documents that Crim signed, see VLG 31, he was impliedly authorized to do so under the circumstances. See Tr. 81, July 12, 2013. Vrdolyak had, with Crim's authorization, already told Lustig that he could have the check; Lustig was on his way to pick up the check when Crim rescinded Vrdolyak's authorization to release it to him. Vrdolyak was left with little choice but

to provide Lustig with some explanation for why he was unable to hand over the check. As Collins put it, "the relationship requires an explanation, and that's not wrong to do that." Tr. 81, July 12, 2013. Providing an explanation also improved Vrdolyak's subsequent ability to obtain information about Crim's loans from Lustig, thereby advancing her interests by providing her with the information she sought to make an informed decision about releasing payment to CFS.

Crim further alleges that VLG breached its duty of confidentiality to her when Vrdolyak told Lustig that she planned to abscond with the money. Vrdolyak credibly testified that he told Lustig no such thing, see Tr. 969-70, July 1, 2013, and Lustig's testimony echoed Vrdolyak's. See Tr. 777-85, June 28, 2013. Crim also testified that she did not have any plans to abscond with the money or to fraudulently conceal the money from CFS, Tr. 127-28, June 25, 2013, and Vrdolyak did not understand Crim's desire to check the numbers to mean that she "was trying to stiff Client Funding." Tr. 548-49, June 27, 2013. Based on the concurrent testimony of these witnesses, the Court concludes that no confidence existed; that is, that Crim never told Vrdolyak that she planned to not pay CFS. The Court also concludes that Vrdolyak did not tell Lustig that Crim planned to not pay CFS. Accordingly, the duty of confidentiality was not breached in this instance. In all likelihood, Lustig simply tracked the statutory language in his complaint, drawing the conclusion that Crim was trying to abscond with his money from the fact that he had not yet been paid. To the extent that Lustig's allegation was litigation hyperbole – since the Court credits Vrdolyak's testimony that he conveyed to Lustig the expressed desire of Crim to simply check the numbers and neither said nor implied that she intended not to pay what she owed – the characterization was Lustig's, not Vrdolyak's.

### C.    Payoff Numbers

Crim alleges that VLG breached its fiduciary duties to her by failing to provide her with

payoff numbers in advance of the September 2009 mediation that settled her personal injury suit for $2,400,000, by engaging CPA Kevin Pierce to audit the loan payoff numbers, and by advising her to settle the loans with CFS quickly to free up her funds, notwithstanding "everyone's inability to compute the loan repayment amount." The Court cannot conclude on the record before it that these actions or inactions constituted breaches of fiduciary duty.

The Court found, from the testimony at trial and record evidence, that Vrdolyak did not know Crim's payoff numbers until December 2009. The Court also found not credible Crim's testimony that she repeatedly asked Vrdolyak for information about the loans in advance of the mediation. The Court finds credible Crim's testimony that she "wish[ed] [she] had never settled" her personal injury suit for $2,400,000 because she "didn't have the information that [she] should have had from Client Funding Solutions," Tr. 300, June 26, 2013; [307] ¶ 39, but that testimony is fatal to Crim's claim here because the information she purportedly lacked was in the hands of CFS, not Vrdolyak. Crim was the point person, and, indeed, the *only* person, involved in discussions and negotiations with CFS. She signed the loan documents without reviewing them or having them reviewed, and she was responsible for keeping apprised of her contractual obligations to CFS. Vrdolyak did not breach fiduciary duties to Crim by failing to provide her with information that he did not have but that she should have had in her own possession – or, at a minimum, should have been able to acquire from Lustig, with whom she had been dealing with directly for years.

The Court likewise finds no breach of fiduciary duty in Vrdolyak's enlistment of CPA Kevin Pierce to review Crim's loan documents at no charge to Crim. No evidence in the record indicates that VLG had a financial or other relationship with Pierce that could have conflicted with VLG's duty of loyalty to Crim. Crim does not appear to allege that the engagement of

Pierce or provision of loan documents to him violated the duty of confidentiality. To the extent that she does, the Court concludes that Vrdolyak was acting with Crim's interests in mind and reasonably believed that providing Pierce with the documents would advance the interests of his client in the representation. Had Crim actively requested that Vrdolyak retain Pierce, paid Pierce for his work, and/or indicated that she was relying on Pierce's work, Crim's complaints about Pierce's work might be stronger. But the record shows that Crim was working with her own team of financial advisors, including Clements and Randle. Vrdolyak's enlistment of Pierce was simply an adjunct to the efforts of Crim and her own advisors. Perhaps everyone would have been better off trying to work carefully with each other and with Lustig to understand the basis for the calculations and any differences they may have had in interpreting the terms of the loan documents, but the consequences of everyone's independent actions cannot be laid exclusively at Vrdolyak's feet.

Finally, the Court concludes that Vrdolyak's advice to Crim that she pay the amount requested by CFS and do so quickly did not constitute a breach of fiduciary duty. Even after CFS filed suit and obtained the Attachment Order, the interest on Crim's loans continued to accrue at a rate of several hundred dollars per day. Vrdolyak assisted Crim in her quest to verify the payoff numbers by gathering information from and communicating with Lustig, interfacing with Crim's friends who were trying to calculate the numbers, and engaging Pierce to audit the numbers. These actions are in line with those that a reasonable attorney attempting to execute his client's requests would undertake. Vrdolyak also explained to Crim why he believed, from a strategic perspective, that settling the CFS lawsuit quickly was in Crim's best interest, and Crim never expressly directed Vrdolyak to go to court or to stop negotiating with CFS. In short, Vrdolyak's actions during the month between the entry of the Attachment Order and his

termination by Crim were consistent with a reasonable legal strategy, with Crim's directives, and with what he told Crim he would do. Moreover, as indicated above, Crim produced no evidence suggesting an improper, financial, or collusive relationship between CFS and VLG. To the contrary, Lustig and Vrdolyak testified credibly that they did not know one another very well and that Lustig did not inform VLG that he intended to file suit against Crim.

### D.  Settlement Funds

Crim contends that VLG breached its fiduciary duties to her when Vrdolyak failed to wire Crim her settlement funds after she requested that he do so on December 27, 2009. Relatedly, she alleges that VLG delayed the distribution of her funds to enable CFS to obtain the Attachment Order. The Court finds the latter allegation wanting because the evidence at trial demonstrated that Vrdolyak had no advance knowledge of the lawsuit or CFS's intent to obtain an attachment order; accordingly, he could not have aided and abetted CFS in its efforts to attach Crim's funds. The Court also concludes that Vrdolyak's failure to wire Crim her settlement funds immediately in response to her December 27, 2009 e-mail request was not a breach of his duties to her. Various circumstances prevented Vrdolyak from immediately complying with Crim's directive, including that the directive was made outside of normal business hours, that Vrdolyak was not physically in his office or even in the same state and his presence was required to process a check the size of Crim's, and that Crim did not sign or date the letter of direction. By the time Vrdolyak returned to the office and was in a position to process Crim's request, the Attachment Order had been issued. The Court additionally finds compelling Vrdolyak's offer to advance Crim funds if she needed them and the jury's verdict that VLG did not convert Crim's funds. It may be that the combination of (1) Lustig's running into court on Christmas Eve, (2) Vrdolyak's holiday trip out of town, and (3) Crim's illness around the Christmas holiday formed

something of a "perfect storm" of events that contributed to Crim not receiving the bulk of her funds until a month later than she otherwise might have. But, as explained above, those circumstances do not amount to a fiduciary duty claim against Vrdolyak or VLG.

Crim also alleges that Vrdolyak deliberately misread the Attachment Order and refused to give her the settlement funds. The Court agrees with Crim to the extent that she alleges that Vrdolyak misread the Attachment Order. As Robinson testified, "the prudent thing to do is to hold back what's in contest." Tr. 55, July 12, 2013. That said, there is no evidence in the record that Vrdolyak misread the Attachment Order deliberately or otherwise proceeded in bad faith or without loyalty to Crim. To the contrary, the evidence showed that Vrdolyak immediately began working with CFS's attorneys to resolve the matter, offered to advance Crim funds if she needed them while the Attachment Order was in place, and complied with Crim's instructions to audit the payoff figures. Vrdolyak may have erred, but any interpretive error on his part does not on the record before the Court constitute a breach of his fiduciary duties to Crim.

### E.    Lawsuit

Crim's final allegations center on VLG's actions and omissions related to the lawsuit and Attachment Order. She contends that VLG breached its fiduciary duties to her by failing to immediately inform Crim that CFS had filed suit against her and intentionally failing to go to state court to help Crim get her money.

The Court concludes that VLG did not breach its duties to Crim by failing to timely apprise her of the lawsuit. The evidence adduced at trial demonstrated that Vrdolyak was unaware of the suit and Attachment Order until he returned to his office on December 30, 2009. It further demonstrated that Vrdolyak e-mailed the Attachment Order to Crim that same day. Crim, who was served with papers "sometime after December 28, 2009," may well have been

aware of the suit before Vrdolyak was. Crim may be suggesting that Vrdolyak should have had better office procedures in place to ensure that he received prompt notification of incoming correspondence. This is not an unreasonable suggestion. But what by all accounts was a simple communication mishap does not under the circumstances here constitute a breach of the duties imposed on VLG by virtue of its fiduciary relationship with Crim.

The Court likewise concludes that no fiduciary duties were breached by Vrdolyak's failure to go to state court in advance of the scheduled hearing to attempt to get Crim's funds released. Crim did not expressly direct Vrdolyak to go to court or file a motion, and he never promised her that he would. At most, he stated that he "could" take that course of action. Vrdolyak assessed the risks and benefits of various courses of action and made the strategic choice – with Crim's apparent assent and cooperation – to work toward resolving CFS's claims prior to the scheduled hearing. The record reflects that he continued to do so until he was terminated on January 22, 2010. No evidence demonstrates that Vrdolyak acted dishonestly, in bad faith, or contrary to Crim's interests. In short, even if (as the Court believes) Vrdolyak misread the Attachment Order, it was not a breach of fiduciary duty to defer further court action until the next scheduled court date, since (1) Vrdolyak had considered the options and settled on a defensible strategy and (2) he had offered to advance additional funds to Crim in the interim. Accordingly, the Court concludes that VLG did not breach its fiduciary duties to Crim by failing to go to state court prior to Crim's termination of Vrdolyak and VLG as her lawyers.

III.    **Conclusion**

For the reasons stated above, the Court concludes that Crim did not prove by a preponderance of the evidence that VLG breached its fiduciary duties to her. Accordingly, the Court finds in VLG's favor on Crim's breach of fiduciary duty claim. The Clerk is instructed to

enter judgment pursuant to Rule 58 as to the jury verdict [291] and the instant bench verdict.

Dated: March 31, 2014

_____
Robert M. Dow, Jr.
United States District Judge